482 January 31, 2024 No. 57

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of H. N.,
a Person Alleged to have Mental Illness.

STATE OF OREGON,
*Respondent,*

*v.*

H. N.,
*Appellant.*

Multnomah County Circuit Court
22CC04064; A179247

Julia A. Philbrook, Judge.

Argued and submitted December 19, 2023.

Christopher J. O'Connor argued the cause for appellant. Also on the brief was Multnomah Defenders, Inc.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Joyce, Judge, and Jacquot, Judge.

JOYCE, J.

Affirmed.

**JOYCE, J.**

Appellant appeals from a judgment committing appellant to the custody of the Mental Health Division for a period not to exceed 180 days and prohibiting her from purchasing or possessing firearms. On appeal, appellant contends that the trial court erred in ordering that she be prohibited from possessing firearms. *See* ORS 426.130 (1)(a)(D) (authorizing court to prohibit a person with a mental illness from purchasing or possessing firearms if it concludes that there is a reasonable likelihood that the person would constitute a danger to self or others). In her view, that order violated her rights under the Second Amendment to the United States Constitution.[1] She argues that the United States Supreme Court's recent decision in *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 US 1, 142 S Ct 2111, 213 L Ed 2d 387 (2022) renders ORS 426.130(1)(a)(D) facially unconstitutional. Because we conclude that barring an individual with a mental illness from possessing firearms is consistent with our nation's history, we affirm.

The background facts are relatively few, and we state them consistently with the trial court's explicit and implicit findings. *State v. D. R.*, 239 Or App 576, 579, 244 P3d 916 (2010). Appellant set fire to her apartment, which is on the top floor of a multi-floor complex. She told firefighters that she started the fire and that she was trying to kill herself. Firefighters were able to contain the fire to appellant's apartment, preventing any spread and potential injury to the other residents in the building. Shortly after she set fire to her apartment, appellant broke into a church. Police found her in the basement, where she told officers that she was "summoning Satan and making coffee." She declined officers' requests to leave with them, instead filling up large pitchers of water and then dumping the water on one of the officers and throwing the empty pitchers at another officer. Officers took her to the hospital, and she was placed on a mental commitment hold.

---

[1] In her first and second assignments of error, appellant argues that the court erred in concluding that she was a person with a mental illness and that she was a danger to herself and others. We have reviewed the record and conclude that the trial court correctly ruled that appellant had a mental illness and was a danger to herself and to others.

Doctors subsequently diagnosed appellant with psychosis. During her time at the hospital, she declined to take medications consistently, and at the time of her commitment hearing, her symptoms remained active.

At the conclusion of the hearing, the trial court concluded that appellant suffered from a mental disorder and was a danger to herself and to others. As relevant to the issue on appeal, it further ordered that appellant was prohibited from purchasing or possessing firearms because there was a reasonable likelihood that she would constitute "a danger to self or others or to the community at large as a result of" her mental state as "demonstrated by past behavior or participation in incidents involving unlawful violence or threats of unlawful violence, or by reason of a single incident of extreme, violent, unlawful conduct." ORS 426.130(1)(a)(D).

Appellant objected, arguing that "any law limiting firearm possession or ownership" is subject to strict scrutiny under the Second Amendment, and "the law that [the court] is using to impose a firearms ban" would not survive that standard. The court rejected that argument.

On appeal, appellant reprises her argument that the firearms prohibition is unconstitutional, both facially and as applied to her. During argument, she conceded that she did not preserve the as-applied challenge and she has not asked for plain error review. We therefore limit our consideration to appellant's argument that ORS 426.130(1)(a)(D) is facially unconstitutional.

As both parties acknowledge, the legal landscape against which we answer that question has shifted in recent years. As we recently explained in *State v. Parras*, 326 Or App 246, 248, 531 P3d 711, *rev pending* (2023), a case addressing whether Oregon's prohibition on felons in possession of firearms was constitutional as applied to the defendant, the Supreme Court's decision in *Bruen* altered how courts consider constitutional challenges to limitations on firearm possession. Yet in *Parras*, we explained that to understand the impact of *Bruen*, we had to begin with an earlier Supreme Court decision, *District of Columbia v. Heller*, 554 US 570, 128 S Ct 2783, 171 L Ed 2d 637 (2008).

*Parras*, 326 Or App at 249. We began there because in *Heller*, the Court discussed the history of limits on people possessing firearms, history that—after *Bruen*—became paramount. Much of that historical discussion is applicable here, albeit in a different context. That is because, as we explain below, the Court expressly addressed historical limits on possession of firearms by individuals with mental disorders in *Heller*. Accordingly, we begin there.

In *Heller*, the Court struck down a law banning possession of handguns in the home and that required other kinds of firearms to be disassembled or bound by a trigger lock. 554 US at 635. The Court observed that the core of the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* Notwithstanding that broad protection, the right is "not unlimited." *Id.* at 595, 626. As particularly relevant here, the Court remarked that bans on the possession of weapons by mentally ill individuals was "longstanding":

> "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose. For example, the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues. Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."

*Id.* at 626-27 (internal citations omitted).

In addition to describing such a limitation as "longstanding[,]" the Court also described such limits as being "presumptively lawful regulatory measures." *Id.* at 627 n 26; *see also McDonald v. Chicago*, 561 US 742, 786, 130 S Ct 3020, 177 L Ed 2d 894 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession

of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' We repeat those assurances here." (Internal citation omitted.)).

After *Heller*, courts considered Second Amendment challenges to limitations on firearm possession by first determining whether the state "establish[ed] that the challenged law regulates activity falling outside the scope of the [Second Amendment] right as originally understood." *Bruen*, 597 US at 18 (internal quotation marks omitted). If not, courts then addressed a second question, assessing "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on that right." *Id.* (internal quotation marks omitted). Courts applied strict scrutiny if the "core" Second Amendment right was burdened; otherwise, courts applied intermediate scrutiny. *Id.*; *see also Parras*, 326 Or App at 250 (describing analysis).

In *Bruen*, the court rejected the first part of that two-part formula and instead held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify [a state's] regulation, *** the regulation [must be] consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 US at 17 (internal citation omitted). Under that standard, it is incumbent upon "the government [to] demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

Post-*Bruen*, then, a restriction like the one at issue here is constitutional only if it is consistent with the nation's history of regulating firearms. Many courts, including our own, have observed the difficulties of deciphering that history, because "[a]n honest search for an 'American' tradition on gun regulation is especially challenging, given that well over half of the American population—including women, Blacks, and others—were generally excluded by law from

political participation at the time of the Second Amendment's passage and for decades thereafter." *Parras*, 326 Or App at 254 (quoting *United States v. Smith*, No 22-CR-20351, 2023 WL 2215779 at *4 (ED Mich Feb 24, 2023)). We also acknowledge that perceptions around mental disorders and its treatment have significantly changed since the time of the Second Amendment's framing.[2]

Nevertheless, deciphering history is what courts are tasked to do after *Bruen*. As we explain below, that history makes it evident—at least as far as history can—that those with mental disorders could be disarmed without running afoul of the Second Amendment.

At the outset, we agree with appellant that the Second Amendment's plain text covers her possession of a firearm. *See Bruen*, 597 US at 24 (if the Second Amendment's plain text covers the defendant's conduct, the Constitution "presumptively" covers that conduct). Thus, we must consider whether ORS 426.130(1)(a)(D) is consistent with the "historical tradition that delimits the outer bounds of the right to keep and bear arms." Bruen, 597 US at 19.

As the state acknowledges, there appear to have been no statutes in existence during the 1700s that disarmed people with mental disorders. Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings LJ 1371, 1376 (2009) (observing that one "searches in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership. Such laws seem to have originated in the twentieth century."). In appellant's view, that absence is fatal to the state's burden under *Bruen*.

But *Bruen* did not hold that a limitation on firearm possession is permissible only if similar regulations existed in the 1700s. Rather, the Court observed that "the lack of a distinctly similar historical regulation addressing that

---

[2] To that end, much of the discussion around individuals with mental disorders has also evolved. The history recounted in this opinion does not always reflect those changes and, indeed, uses demeaning terminology to describe people suffering from mental disorders. To the extent we quote that terminology, we do so only to capture the historical limitations on those with mental disorders from possessing firearms.

problem" is "relevant evidence"—not dispositive evidence— that the challenged law is unconstitutional. *Bruen*, 597 US at 26. Indeed, the Court went on to observe that there may be "modern regulations that were unimaginable at the founding." *Id.* at 28. In those cases, courts must resort to "reasoning by analogy," which requires "only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 597 US at 30 (emphases in original); *see also Parras*, 326 Or App at 257 (rejecting the defendant's challenge to the felon-in-possession prohibition even though "it may be true that prohibitions on the possession of firearms by people convicted of felonies did not exist at the time of the framing of the Second Amendment").

The absence of laws excluding individuals with mental disorders from possessing firearms is likely attributable to the fact that such laws were viewed as unnecessary at the time of the Second Amendment's framing. That is because it was generally accepted that people suffering from mental disorders could be hospitalized and deprived of their personal liberty even in the absence of any laws allowing for that process. Larson, 60 Hastings LJ at 1377 (observing that justices of the peace were authorized to "lock up" "lunatics" who were considered dangerous); *see also Keyes v. Lynch*, 195 F Supp 3d 702, 718 (MD Pa 2016) ("the strongest originalist argument for the exception of the mentally ill [from the right to bear arms] rests on the traditional ability of justices of the peace to confine individuals with dangerous mental impairments" (quoting Larson, 60 Hastings LJ at 1378)); Gerald N. Grob, *The Mad Among Us: A History of the Care of America's Mentally Ill* 5-21, 29, 43 (1994) (explaining that individuals with mental disorders were often removed from the community through involuntary commitment to welfare and penal institutions). For that reason, statutes like the one here—which authorize trial courts to deprive an individual with a mental disorder of their personal liberty only if a court follows a specific, detailed process that includes providing the allegedly mentally ill person with counsel and other due process protections—would have been

"unimaginable" to the framers of the Second Amendment. *Bruen*, 597 US at 28 (turning to history to "guide our consideration of modern regulations that were unimaginable at the founding"). We thus turn to the question whether any historically analogous traditions existed that prohibited people with mental disorders from possessing firearms.

We begin with *Heller*'s reference to "longstanding" limitations on individuals with mental disorders being permitted to possess firearms. *Heller*, 554 US at 626. To be sure, as appellant notes, *Heller* did not involve the question whether a limitation on individuals with mental disorders possessing firearms was constitutional. As a result, its reference to those prohibitions as being "longstanding" (a statement echoed in *McDonald*), has created debate among courts as to whether those statements are binding or merely dicta. *Compare U.S. v. Vongxay*, 594 F3d 1111, 1115 (9th Cir 2010) (treating *Heller*'s "presumptively lawful" language as binding), *with U.S. v. Skoien*, 614 F3d 638, 640 (7th Cir 2010) (treating it as dicta).

Binding or not, it is notable that the Supreme Court included that language, reiterated it in *McDonald*, and that five justices writing separately in *Bruen* made clear that nothing in the decision was intended to alter the observation that such prohibitions were "longstanding." Justice Alito, in a concurrence, specifically noted that the opinion should not be read to have "disturbed anything that we said in *Heller* or [*McDonald*] about restrictions that may be imposed on the possession or carrying of guns." *Bruen*, 597 US at 72 (Alito, J., concurring). And Justice Kavanaugh, in his concurrence, mirrored that understanding as well. See id. at 81 (Kavanaugh, J., concurring) (reiterating language from *Heller* and *McDonald* about "longstanding prohibitions on the possession of firearms by felons and the mentally ill"). In his dissent, which Justices Sotomayor and Kagan joined, Justice Breyer also highlighted *Heller*'s reference to prohibitions on firearm possession by the mentally ill and stated that "[l]ike Justice Kavanaugh, I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding." *Id.* at 129.

More to the point, however, is that the statement in *Heller* is consistent with history; in other words, limitations on people with mental disorders possessing firearms are in fact "longstanding." According to some historical accounts, individuals with a mental disorder, along with felons and children, were categorially excluded from the Second Amendment's protections.[3] *State v. Hirsch/Friend*, 338 Or 622, 669-70, 114 P3d 1104 (2005), *overruled on other grounds by State v. Christian*, 354 Or 22, 307 P3d 429 (2013) (the right to arms does not preclude laws "disarming the unvirtuous (*i.e.* criminals) or those who, like children or the mentally unbalanced, are deemed incapable of virtue" (citing Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn L Rev 461, 480 (1995))); *see also* Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to "Bear Arms"*, 49 Law & Contemp Probs 151, 161 (1986) (concluding that historically, "criminals, children, and those of unsound mind may be deprived of firearms" (internal citations and footnotes omitted)).

Those categorial prohibitions, at least in the case of those suffering from mental disorders, were not explicitly tied to any dangerousness that those individuals may have posed to themselves or others. But other historical accounts describe a more general firearms prohibition on individuals who were considered a danger to themselves or to others. *See Keyes*, 195 F Supp 3 at 719 ("[T]here is clear historical evidence that persons prone to violent behavior were outside the scope of Second Amendment protection."); *Binderup v. Atty. Gen. U.S. of America*, 836 F3d 336, 368 (3d Cir 2016), *cert den*, 137 S Ct 2323 (2017) (Hardiman, J., concurring) (explaining, with reference to the Journal of Convention from the 1788 Massachusetts ratifying convention and proposals made at the New Hampshire ratifying convention, that "[a] number of firearms restrictions from the founding and pre-founding era support" the conclusion that "the right

---

[3] We have been unable to determine precisely what vehicle those exclusions took. As noted above, no laws existed that prohibited people with mental disorders from possessing firearms. It nevertheless is generally historically accepted that those individuals, along with felons and infants, were not entitled to Second Amendment protections.

to keep and bear arms was understood to exclude those who presented a danger to the public"); *Kanter v. Barr*, 919 F3d 437, 455-56 (7th Cir 2019) (Barrett, J., dissenting) (describing debates at the Pennsylvania, Massachusetts, and New Hampshire ratifying conventions as "evidence of the scope of founding-era understandings regarding categorical exclusions from the enjoyment of the right to keep and bear arms"; stating that the "concern common to all three *** is about threatened violence and the risk of public injury"; and explaining that "[t]his is the same concern that animated English and early American restrictions on arms possession"); *see also id.* at 464 ("[h]istory *** support[s] the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous").[4]

That historical background reveals that it has long been this country's "tradition" to disarm those who suffer from mental disorders, whether categorically or because they pose a danger to themselves or to others. Given that history, we conclude that the state has met its burden to show that ORS 426.130(1)(a)(D) is consistent with "this Nation's historical tradition of firearm regulation." *Bruen*, 597 US at 17. Accordingly, ORS 426.130(1)(a)(D) is facially constitutional.[5]

Affirmed.

---

[4] *See also* Stephen P. Halbrook, *The Founders' Second Amendment* 190-215 (2008) (surveying the debates at the ratifying conventions and highlighting the commonplace understanding that "dangerous persons could be disarmed"); Patrick J. Charles, *"Arms for Their Defence"?: An Historical, Legal, and Textual Analysis of the English Right to Have Arms and Whether the Second Amendment Should Be Incorporated in McDonald v. City of Chicago*, 57 Clev St L Rev 351, 382 (2009) (the Crown had the authority "to disarm not only papists, but dangerous and disaffected persons as well").

[5] We note that the order prohibiting appellant from purchasing or possessing a firearm "shall remain in effect until relief is granted under ORS 166.273." ORS 166.273(5) entitles appellant to relief from the order if she shows that she is unlikely "to act in a manner that is dangerous to public safety" and that relief "would not be contrary to the public interest." *See* ORS 166.250(1)(c)(D) (prohibiting a person who "[w]as committed to the Oregon Health Authority under ORS 426.130" from possessing a firearm); ORS 166.273(1)(a) (providing that those "barred from possessing or receiving a firearm" may petition the Psychiatric Security Review Board "for relief from the bar if *** [t]he person is barred from possessing a firearm under ORS 166.250(1)(c)(D)"). That is, the ban on firearms under the statute is not permanent; once an individual no longer poses a danger to themselves or to others, they may petition to regain the right to possess a firearm.