556 March 12, 2025 No. 200

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

Joseph ARNOLD
and Cliff Asmussen,
*Plaintiffs-Respondents,*
*and*

GUN OWNERS OF AMERICA, INC.,
and Gun Owners Foundation,
*Plaintiffs,*

*v.*

Tina KOTEK,
Governor of the State of Oregon, in her official capacity;
Dan Rayfield, Attorney General of the State of Oregon,
in his official capacity; and Casey Codding,
Superintendent of the Oregon State Police,
in his official capacity,
*Defendants-Appellants.*

Harney County Circuit Court
22CV41008; A183242

Robert S. Raschio, Judge.

Argued and submitted October 29, 2024.

Robert Koch, Assistant Attorney General, argued the cause for appellants. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Tony L. Aiello, Jr., argued the cause for respondents. Also on the brief were Tyler D. Smith and Tyler Smith & Associates, P.C.

Nadia Dahab and Sugerman Dahab filed the brief amici curiae for Lift Every Voice Oregon, Ceasefire Oregon, Central Oregon Gun Safety Advocates, Jewish Federation of Greater Portland, League of Women Voters of Oregon, Muslim Educational Trust, Ecumenical Ministries of Oregon, VIVA Inclusive Migrant Network, and Albina Ministerial Alliance.

Elizabeth C. Savage and Elizabeth Savage Law, PC, filed the brief amicus curiae for Portland Metro Chamber.

Jessica G. Ogden, Matthew T. Nelson, and Covington & Burling, LLP, New York, NY; Timothy C. Hester and Covington & Burling, LLP, Washington, DC; Priya S. Leeds and Covington & Burling, LLP, San Francisco, CA; Douglas N. Letter and Shira Lauren Feldman; Esther Sanchez-Gomez and Giffords Law Center to Prevent Gun Violence; Ciara Wren Malone; and Zachary J. Pekelis, W. Scott Ferron, and Pacifica Law Group, LLP; filed the brief amicus curiae for Brady Center to Prevent Gun Violence, Giffords Law Center to Prevent Gun Violence, March for Our Lives, Oregon Alliance for Gun Safety, Alliance for Gun Responsibility, and Gun Owners for Responsible Ownership.

Margaret S. Olney and Bennett Hartman, LLP, filed the brief amici curiae for The Oregon Medical Association, Oregon Pediatric Association, Oregon Nurses Association, Oregon Academy of Family Physicians, Oregon, Oregon Chapter of the American College of Physicians, Oregon Chapter of the American College of Emergency Room Physicians, Oregon Society of Physicians Assistants, Oregon Psychiatric Physicians Organization, and Oregon Physicians for Social Responsibility.

Dominic Carollo and Carollo Law Group filed the brief amici curiae for Eastern Oregon Counties Association and Oregon Farm Bureau Federation.

Before Ortega, Presiding Judge, Hellman, Judge, and Mooney, Senior Judge.

ORTEGA, P. J.

Reversed and remanded.

**ORTEGA, P. J.**

In November 2022, the people of Oregon enacted Ballot Measure 114, the Reduction of Gun Violence Act, which is a comprehensive law that makes three major changes in Oregon's gun laws: It requires a permit to purchase a firearm from any transferor; it requires the completion (not just the initiation) of a criminal background check of the transferee at the point-of-transfer for a firearm; and it limits lawful firearm magazine capacity to 10 or fewer rounds, with certain exceptions, most notably for law enforcement and the military. *See* Or Laws 2023, ch 1 (Ballot Measure 114). Plaintiffs challenged the facial constitutionality of the measure under Article I, section 27, of the Oregon Constitution, which provides that "[t]he people shall have the right to bear arms for the defence [*sic*] of themselves, and the State[.]"[1] In a general judgment, the circuit court declared that Measure 114 was facially unconstitutional and permanently enjoined enforcement of the law. The court also entered a supplemental judgment awarding plaintiffs $5,374 in costs, a $105 prevailing party fee, and $196,790 in attorney fees. The state appeals from both judgments. We conclude that all of Measure 114 is facially constitutional under Article I, section 27, based on the established legal test set out in *State v. Christian*, 354 Or 22, 307 P3d 429 (2013).[2] Accordingly, we reverse. We remand to the circuit court for the limited purposes of entering a declaratory judgment consistent with our opinion and determining whether the state is entitled to fees or costs.

---

[1] Plaintiffs do not raise a challenge under the Second Amendment to the United States Constitution. Measure 114 has been challenged separately under the Second Amendment in federal court. After a bench trial, the District Court of Oregon upheld Measure 114, *Oregon Firearms Fed'n v. Kotek*, 682 F Supp 3d 874 (D Or 2023); *Oregon Firearms Fed'n, Inc. v. Brown*, 644 F Supp 3d 782 (D Or 2022) (denying a temporary restraining order), and the case is currently on appeal in the Ninth Circuit Court of Appeals. We express no opinion on the fact-finding approach undertaken by the district court to address the facial challenge under the Second Amendment, except to note that a facial challenge under Article I, section 27, proceeds under a legal framework established by the Oregon Supreme Court which does not rely on that type of fact finding or on Second Amendment jurisprudence.

[2] The state raises six assignments of error on appeal. Because we reverse based on the state's first assignment of error, we do not address any other assignment.

## I.   PROCEDURAL BACKGROUND

In November 2022, the people of Oregon enacted Measure 114, which amends ORS 166.210 to 166.490, the statutes that regulate the possession and use of weapons and the sale and transfer of firearms.[3] Measure 114 makes three major changes to the law: It requires a permit to purchase a firearm (the permit-to-purchase program); it requires the completion of a background check of the transferee at the point-of-transfer for a firearm (the point-of-transfer background check); and it limits lawful firearm magazine capacity to 10 or fewer rounds (the large-capacity magazine ban). Measure 114 includes an express policy statement enacted as part of the legislation, which provides:

> "The People of the State of Oregon find and declare that regulation of sale, purchase and otherwise transferring of all firearms and restriction of the manufacture, import, sale, purchase, transfer, use and possession of ammunition magazines to those that hold no more than 10 rounds will promote the public health and safety of the residents of this state and this Act shall be known as the Reduction of Gun Violence Act."

Measure 114, § 2.

Shortly after the people of Oregon enacted Measure 114, plaintiffs filed for declaratory and injunctive relief, alleging that the measure was facially unconstitutional under Article I, section 27. Plaintiffs' complaint did not allege an as-applied challenge to the measure. In advance of trial, plaintiffs applied for and the circuit court issued a temporary restraining order and preliminary injunction that prevented the measure from going into effect until a trial could be held. The state sought mandamus relief from the injunction in the Supreme Court, which was denied. *Arnold v. Kotek*, 370 Or 716, 524 P3d 955 (2023). After a six-day trial that primarily included testimony from experts on the historical record of firearms, modern day firearms, and gun violence, the circuit court issued a comprehensive letter opinion. The court considered two aspects of Measure

---

[3] For ease of reference, we refer to the section numbers in Measure 114, and not the codified statute numbers in the Oregon Revised Statutes, throughout this opinion.

114 separately: the permit-to-purchase program and the large-capacity magazine ban. The court did not address the point-of-transfer background check because it considered it a part of the permit-to-purchase program. In sum, the court determined that both aspects of the measure were facially unconstitutional under Article I, section 27, and permanently enjoined enforcement of the measure.[4] As a result, Measure 114 has never gone into effect.

With regard to the permit-to-purchase program, the court determined that "Oregon citizens have a right to self-defense against an imminent threat of harm, which is unduly burdened by Ballot Measure 114's permit to purchase scheme." In arriving at that conclusion, the court stated that the parties agreed on three "facts" that it found fatal to the constitutionality of the law: that Measure 114 delays purchases of firearms for a minimum of 30 days, that the program derives its language from the concealed handgun license statute, and that the Federal Bureau of Investigation (FBI) refuses to conduct criminal background checks which are required by the measure.[5] The court concluded that the "30-day absolute prohibition on the initial purchase of a firearm is not permitted under the Oregon Constitution"; that using the concealed handgun license scheme is impermissible because it allows "review of a decision by an elected official under the principles of due process" instead of under "intermediate scrutiny" where the burden is on the government to show an important government objective and competent evidence to restrain the right and because it "flip[s] the burden of proof, requiring citizens to prove they are not dangerous"; and that, because the FBI will not conduct criminal background checks, a permit-to-purchase cannot be issued under Measure 114 without going through the judicial review process, which unduly burdens the Article I, section 27, right. The court also relied on the state "fail[ing] to provide any convincing evidence of a threat to public safety

---

[4] The circuit court ruled that it would address only the facial constitutionality of Measure 114 and would not address an as-applied challenge. Plaintiffs do not seek review of that ruling on appeal.

[5] We note here that parties cannot stipulate to how a statute operates, and it is not a question of fact. It is the role of the courts to correctly interpret statutes as a matter of law.

requiring a permitted process," failing to "provide sufficient evidence to find these harms require a complete restraint to firearm purchases for at least 30 days," and failing to provide "evidence the program would help reduce [gun violence] harms." The court refused to consider the preamble to the measure, which was presented to the voters, because the state did not prove that it was factually true.

With respect to the large-capacity magazine ban, the circuit court concluded that large-capacity magazines are protected arms under Article I, section 27. The court then concluded that "most firearms, except those specifically excluded by the definition in Ballot Measure 114, are banned under by [*sic*] Ballot Measure 114, because there is no effective way of limiting magazines to ten rounds or less by permanently alter[ing] them and the magazines are readily capable of alteration or changed to carry more than ten rounds within seconds." The court's reasoning was based on its reading of the definition of "large-capacity magazine" in Measure 114, which includes a magazine that "can be readily restored, changed, or converted to accept, more than 10 rounds of ammunition," Measure 114, § 11(1)(d), and that "permanently altered" means that "it is not capable, now or in the future, of accepting more than 10 rounds of ammunition," Measure 114, § 11(1)(d)(A), and on expert testimony that components can be removed from magazines such that they could hold more than 10 rounds and that permanent alterations to larger magazines could be removed with a drill or other methods. The court concluded that the effective ban on most firearms was facially unconstitutional.

The court also determined that banning large-capacity magazines did not enhance public safety to a degree that allowed the undue burden on the Article I, section 27, right, because: (1) off-duty officers would not be able to possess their issued weapons, and could not respond directly to emergent situations, (2) citizens use large-capacity magazine firearms to defend themselves, (3) mass shootings are "very rare," (4) defendants did not "show the limitation of ten rounds has any demonstrable effect on negative outcomes to mass shooting events," (5) most untrained persons can reload within six seconds and trained persons can reload in

around two seconds, and (6) "there is no clarity in the literature about how often large-capacity magazines were used" in mass shootings.

The court entered a general judgment that declared Measure 114 facially unconstitutional and permanently enjoined enforcement of the law. The court also entered a supplemental judgment awarding plaintiffs costs and fees.

The state now appeals both of those judgments.

## II.  LEGAL FRAMEWORK

We begin with a discussion of the legal framework that we are required to apply in this case on a facial constitutional challenge under Article I, section 27.

A.  *Standard of Review*

We review as a matter of law a facial challenge under Article I, section 27, as well as any necessary statutory interpretation of Measure 114. *See Christian*, 354 Or at 26, 40 (taking that approach). There is some dispute between the parties over how we should review factual findings that the circuit court made based on the testimony offered below. Ultimately, we do not address those findings, because the circuit court's analysis did not adhere to the legal framework that we are required to follow as set out in *Christian* and discussed below, which if followed, would have made most of the court's findings irrelevant to its legal decision.[6] As the Supreme Court recognized in the course of rejecting the notion that a party has a burden of proof or persuasion with respect to the facial constitutionality of a law:

> "'[A]n ambiguity in the constitution or in a statute does not, by itself, create an issue of fact, let alone one that must be resolved by the presentation of evidence.' *Ecumenical*

---

[6] For example, the circuit court made extensive findings about whether a threat to public safety exists that requires the regulations in Measure 114 and about whether the regulations in Measure 114 would, in fact, address such threats. As explained below, those inquiries are not part of the legal question before a court that has been asked to resolve a facial challenge under Article I, section 27.

We further note that, on appeal, plaintiffs have asserted the position that the state, as the law's proponent, has a burden to prove "the law's necessity for, and actual furtherance of, public safety." We reject that assertion as explained here and below.

*Ministries v. Oregon State Lottery Commission*, 318 Or 551, 558, 871 P2d 106 (1994). Rather, the court's "'sole duty * * * is to resolve the dispute in terms of the applicability of * * * the constitutional provision[]'" that defendants invoke, that is, Article I, section 27. *Id.* at 559 (quoting *Monaghan v. School District No. 1*, 211 Or 360, 363, 315 P2d 797 (1957) (first ellipsis in *Ecumenical Ministries*))."

*State v. Hirsch/Friend*, 338 Or 622, 630-31, 114 P3d 1104 (2005), *overruled in part*, *Christian*, 354 Or at 40 (overruled to the extent that *Hirsch/Friend* permitted a facial overbreadth challenge under Article I, section 27); *see also Christian*, 354 Or at 34, 40-41 (assigning no burdens of proof or persuasion and addressing facial constitutionality under Article I, section 27, purely as a matter of law). *Cf. Payless Drug Stores Northwest v. Brown*, 300 Or 243, 247, 708 P2d 1143 (1985) ("The [facial] constitutionality of a law as enacted is rarely if ever dependent on facts, least of all on the kind of facts denominated as 'adjudicative facts' in the Oregon Evidence Code (Rule 201(a)) and subject to being proved by evidence. This is so because almost all laws are written to govern numerous concrete situations under circumstances that may change over time."). To the extent findings of historical fact are referred to in our decision, those facts are about the history of firearms and the mechanical operation of modern-day firearms. We do not perceive any dispute in the record on the limited facts that we refer to. Thus, we understand our task as addressing the legal question of whether Measure 114 is facially valid under Article I, section 27. *See Christian*, 354 Or at 34, 40-41 (addressing questions posed by a facial challenge under Article I, section 27, as purely questions of law); *see also State v. Delgado*, 298 Or 395, 400-03, 692 P2d 610 (1984) (addressing as a pure question of law whether a switchblade knife was a constitutionally protected arm under Article I, section 27, using historical treatises).

B.   *Legal Framework for Facial Challenge Under Article I, Section 27*

The legal framework for addressing a facial challenge under Article I, section 27, is established by Supreme Court case law and circumscribes the scope of our review in important ways. First, on a facial challenge under Article I, section 27, our review "is limited to whether the [law] is capable of

constitutional application in any circumstance." *Christian*, 354 Or at 40. That is, "[f]or a statute to be facially unconstitutional, it must be unconstitutional in all circumstances, *i.e.*, there can be no reasonably likely circumstances in which application of the statute would pass constitutional muster." *State v. Sutherland*, 329 Or 359, 365, 987 P2d 501 (1999); *cf. City of Portland v. Sottile*, 336 Or App 741, 744, 561 P3d 1159 (2024) (stating with respect to a facial challenge under the Second Amendment to the United States Constitution that "[a] facial challenge is 'the most difficult challenge to mount successfully,' because it 'requires a defendant to establish that no set of circumstances exists under which' the law would be valid." (Quoting *United States v. Rahimi*, 602 US 680, 693, 144 S Ct 1889, 1898, 219 L Ed 2d 351 (2024))). In making that clarification in *Christian*, the court held that an overbreadth challenge is not a challenge that can be brought on a facial challenge under Article I, section 27.[7]

Second, our review is circumscribed by the Supreme Court's prior interpretation and application of Article I, section 27. In *Christian*, the Supreme Court explored its jurisprudence on Article I, section 27, and pulled together the key features that we must apply in this case. The right that Article I, section 27, establishes is an "individual right to bear arms for purposes limited to self-defense," which limits the scope of the constitutionally protected conduct. *Christian*, 354 Or at 30 (citing *State v. Kessler*, 289 Or 359, 614 P2d 94 (1980)). The self-defense right is also limited to self-defense using constitutionally protected arms. *Id.* As to whether a weapon is so constitutionally protected, the court in *Delgado* stated:

"The appropriate inquiry in the case at bar is whether a kind of weapon, as modified by its modern design and function, is of the sort commonly used by individuals for personal defense during either the revolutionary and

---

[7] In a facial overbreadth challenge, the challenger "need not demonstrate that the statute at issue is unconstitutional under the particular circumstances at hand. Rather, the challenger will prevail in his or her facial challenge if the court concludes that the statute in question prohibits constitutionally protected conduct of any kind." *Hirsch/Friend*, 338 Or at 628. In *Christian*, the Supreme Court concluded that facial overbreadth challenges are not cognizable in Article I, section 27, challenges and overruled *Hirsch/Friend* and *State v. Blocker*, 291 Or 255, 630 P2d 824 (1981), to the extent those cases allowed such challenges. *Christian*, 354 Or at 40.

post-revolutionary era, or in 1859 when Oregon's consti-
tution was adopted. In particular, it must be determined
whether the drafters would have intended the word 'arms'
to include the [weapon at issue] as a weapon commonly
used by individuals for self defense."

*Delgado*, 298 Or at 400-01 (footnote omitted).

The court, in *Christian*, summarized the contours
of the right to bear arms enshrined in Article I, section 27,
as follows:

"Because the right to bear arms is not an absolute right,
our Article I, section 27, holdings reflect a judicial recogni-
tion that the legislature has wide latitude to enact specific
regulations restricting the possession and use of weapons to
promote public safety. We have consistently acknowledged
the legislature's authority to enact reasonable regulations
to promote public safety as long as the enactment does not
unduly frustrate the individual right to bear arms for the
purpose of self-defense as guaranteed by Article I, section
27."

354 Or at 33.[8] Further, as explained in *Hirsch/Friend*, 338
Or at 639, the right in Article I, section 27, is not balanced
against state interests; "rather, any constitutional limita-
tions on the state's actions 'must be found within the lan-
guage or history' of the constitution itself." (Quoting *Eckles
v. State of Oregon*, 306 Or 380, 399, 760 P2d 846 (1988), *cert
dismissed*, 490 US 1032 (1989)).

C.  *Synthesized Legal Framework*

From the foregoing, the question we must address
in this case is whether the enacting body—here, the peo-
ple of Oregon—enacted a reasonable regulation governing

---

[8]  Similarly, in *Hirsch/Friend* the court stated:

"First, when the drafters of the Oregon Constitution adopted and approved
the wording of Article I, section 27, they did not intend to deprive the legisla-
ture of the authority to restrict arms possession (and manner of possession)
to the extent that such regulation of arms is necessary to protect the public
safety. Second, and more significantly for our purposes here, Article I, section
27, does not deprive the legislature of the authority (1) to designate certain
groups of persons as posing identifiable threats to the safety of the commu-
nity by virtue of earlier commission of serious criminal conduct and, in accor-
dance with such a designation, (2) to restrict the exercise of the constitutional
guarantee by members of those groups."

338 Or at 677.

the possession and use of constitutionally protected arms in order to promote public safety without unduly frustrating the right to armed self-defense as guaranteed by Article I, section 27. *Christian*, 354 Or at 33. In making that determination, we are addressing legal questions of the enacting body's purpose and the reasonableness of the regulation to achieve that purpose—*i.e.*, whether the regulation is directed at and drafted to achieve the public-safety purpose. If, as a legal matter, the measure is a reasonable regulation to promote public safety, there is one remaining legal question: Is the right to armed self-defense unduly frustrated? That question, in turn, is not answered by the use of a balancing test. Any constitutional limitation on a reasonable regulation to promote public safety "must be found within the language or history of the constitution itself." *Hirsch/Friend*, 338 Or at 639 (internal quotation marks omitted).

To be clear, a facial challenge under Article I, section 27, does not involve fact finding to answer those legal questions. In particular, the legal inquiry is not aided by a battle of the experts attempting to persuade a trier of fact about whether a public-safety threat, in fact, exists or whether a public-safety benefit, in fact, will be realized. Despite those established parameters for a facial challenge under Article I, section 27, and for reasons that are unclear to us, the parties and the circuit court ended up treating those legal issues as factual. As a result, we largely are not aided in our work here by the record developed below or the findings of fact that the circuit court made on that record.[9]

Guided by that legal framework, we turn to the text of Measure 114 and whether, on its face, it is constitutional under Article I, section 27.

## III.  ANALYSIS

As previously stated above, Measure 114 adds three major components to the firearm regulatory scheme—the permit-to-purchase program, the point-of-transfer

---

[9] We recognize that expert witnesses on the history of firearms or the operation of modern-day firearms could be appropriate if such testimony aids the court in addressing the legal issue of whether a particular weapon falls within the protection of "arms" under Article I, section 27. However, as discussed below, that is not an issue we ultimately reach in this opinion.

background check, and the large-capacity magazine ban. We address the facial constitutionality of those three changes in the law under Article I, section 27.

A.  *Permit-to-Purchase Program and Point-of-Transfer Background Check*

As an initial matter, we note again that the circuit court determined that the permit-to-purchase program and the point-of-transfer background check were intertwined and could not be analyzed separately under the severability clause of Measure 114. On appeal, the state argues that the two parts of Measure 114 are severable and can be analyzed separately; and plaintiffs defend the circuit court's approach. We conclude that, whether considered together or alone, both parts of Measure 114 are facially constitutional. Consequently, we do not address the parties' severability arguments.

1.  *Text of sections 3 through 10 of Measure 114*

Sections 3 through 10 of Measure 114 cover the permit-to-purchase program and point-of-transfer background check, which are codified at ORS 166.503 to 166.508, and in amendments to ORS 166.412, ORS 166.435, ORS 166.436, and ORS 166.438. The permit-to-purchase program requires that, to purchase any firearm, a person must apply for and obtain a permit-to-purchase from the police chief or county sheriff, or their designee, with jurisdiction over the person's residence (the permit agent). Measure 114, § 4(1)(a). The person must present that permit-to-purchase at the point-of-transfer for any firearm, whether the transfer is through a licensed gun dealer, a gun show, or a private transfer. Measure 114, §§ 6, 7, 8, 9. Measure 114 also amends existing law to require that a criminal background check must be completed at the point-of-transfer of a firearm before the firearm is transferred, whether through a gun dealer, gun show, or private transfer. Prior to the enactment of Measure 114, the law required that a criminal background check be requested from the Oregon State Police (OSP) but allowed the transfer to occur if OSP did not respond within a certain time. Under Measure 114, if the background check is not approved, the firearm may not be transferred. Measure 114,

§ 6(3)(c), (14) (licensed gun dealers); Measure 114, § 7(3)(d)(B) (private transfers); Measure 114, § 8(2), (3)(c) (gun shows).

For the permit-to-purchase program, the permit agent is required to issue the permit-to-purchase to a person within 30 days of receiving an application "if the permit agent has verified the applicant's identity and determined that the applicant has met each of the qualifications." Measure 114, § 4(3)(a). A person is qualified to be issued a permit-to-purchase if the person (1) "[i]s not prohibited from purchasing or acquiring a firearm under state or federal law, including but not limited to successfully completing a criminal background check as described under paragraph (e) of this subsection"; (2) is not the subject of an extreme risk protection order under ORS 166.525 to 166.543; (3) "[d] oes not present reasonable grounds for a permit agent to conclude that the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state or as demonstrated by the applicant's past pattern of behavior involving unlawful violence or threats of unlawful violence"; (4) provides proof of completion of a firearm safety course; and (5) pays the fee required by the permit agent, which cannot exceed $65. Measure 114, § 4(1)(b), (3)(b). Once issued, a permit-to-purchase is valid for five years, as long as it is not revoked, and can be renewed. Measure 114, § 4(7).

If the permit agent denies a permit or revokes a previously issued permit, the permit agent must notify the person in writing of the reasons for the denial or revocation. Measure 114, § 5(1), (3). A person who is denied a permit, is denied renewal of a permit, has a permit revoked, or whose application is not acted upon within 30 days, may petition the circuit court for review of the decision or inaction. Measure 114, § 5(1), (5), § 10. Those decisions can be appealed to the Court of Appeals in the same manner as any civil action. Measure 114, § 11.

2. *Construction of Sections 3 to 10 of Measure 114*

We first address a few issues of statutory construction in the circuit court's opinion and raised by plaintiffs on appeal. In construing a statute, we review for legal error

and apply our usual methodology for interpreting statutes to discern the intent of the enacting body—here, the people of Oregon. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). We primarily consider the text and context of the statute and, when it is useful to our analysis, we will also consider legislative history. *Id.*

Plaintiffs assert, and the circuit court below agreed, that the permit-to-purchase program will cause at least a 30-day delay in purchasing a firearm. We reject that assertion as untethered to the text of Measure 114. The plain text of the measure requires the permit agent to act on the application within 30 days of receiving it—which also encompasses the time to get the background check—but nothing in the measure prevents the permit agent from acting sooner when qualifications are met. Measure 114, § 4(3)(a). In addition, it is only if the permit agent fails to fulfill the agent's statutorily required duty within the 30 days (or denies the permit) that a permit applicant would need to seek relief from the court. If judicial review is sought, the circuit court reviews for "whether the petitioner meets the criteria that are used for issuance of a permit-to-purchase and, if the petitioner was denied a permit, whether the permit agent has reasonable grounds for denial under subsection (2)" and must make its decision within 15 judicial days "or as soon as practical thereafter." Measure 114, § 5(6), (8). Although the circuit court in this case stated that the administrative review "flip[s] the burden" to the applicant to prove they are not dangerous in order to exercise their Article I, section 27, right, the plain text of the measure does not do that. Both at the administrative level and on judicial review, the burden remains on the state actor to provide sufficient justification to deny a permit-to-purchase as provided in the measure.

In addition, although the wording is not a picture of clarity, nothing in Measure 114 requires cooperation from the FBI to issue a permit-to-purchase. A "criminal background check" and "criminal history record check" are terms defined under ORS 166.432 and they both mean "determining the eligibility of a person to purchase or possess a firearm by reviewing state and federal databases, including" the five listed databases in the statute. Completion of that

statutorily defined criminal background check does not require receiving information from the FBI. For purposes of the permit-to-purchase, the measure requires OSP to request that the FBI run a fingerprint criminal background check and report any information received, but obtaining that FBI information is not necessary to complete the statutory "criminal background check." *See* Measure 114, § 4(1)(e) ("The permit agent shall request the department to conduct a criminal background check, including but not limited to a fingerprint identification, through the Federal Bureau of Investigation. \*\*\* Upon completion of the criminal background check \*\*\*, the department shall report the results, including the outcome of the fingerprint-based criminal background check, to the permit agent.").

With that understanding of the plain text of Measure 114, we proceed to the constitutional analysis.

3. *Article I, section 27, analysis*

As set out above, our task is to confront whether Measure 114 is a reasonable regulation on the possession or use of a weapon to promote public safety without unduly frustrating the right to armed self-defense guaranteed by Article I, section 27. Our analysis is "limited to whether the [measure] is capable of constitutional application in any circumstance." *Christian*, 354 Or at 40.

We first observe that the permit-to-purchase program and point-of-transfer background check is not a total ban on obtaining firearms for self-defense. Persons who meet the qualifications for a permit and do not have any disqualifying criminal convictions may obtain a firearm. *See, e.g.*, *Christian*, 354 Or at 34, 40-41 (rejecting a challenge to an ordinance under Article I, section 27, and relying on the fact that the ordinance was not a total ban on possessing a loaded firearm for self-defense in a public place).

The preamble to Measure 114, which informs our understanding of the legislative purpose for the people's decision to enact the measure, *Oregon Cable Telecommunications v. Dept. of Rev.*, 237 Or App 628, 641, 240 P3d 1122 (2010), sets out that the two programs are a specific legislative response to identified public safety concerns. Specifically

with respect to the permit-to-purchase and point-of-transfer background check, the preamble states:

> "Whereas the People of the State of Oregon have seen a sharp increase in gun sales, gun violence, and raised fear in Oregonians of armed intimidation, it is imperative to enhance public health and safety in all communities; and

> "Whereas the gun violence in Oregon and the United States, resulting in horrific deaths and devastating injuries due to mass shootings, homicides and suicides is unacceptable at any level, and the availability of firearms, including semiautomatic assault rifles and pistols with accompanying large-capacity ammunition magazines, pose a grave and immediate risk to the health, safety and well-being of the citizens of this State, particularly our youth; and

> "Whereas Oregon currently has no permit requirements for purchasing a semiautomatic assault firearm or any other type of weapon and studies have shown that permits-to-purchase reduce firearm-related injuries and death and studies further have shown that firearm ownership or access to firearms triples the risk of suicide and doubles the risk of homicide when compared to someone who does not have access, this measure will require that anyone purchasing a firearm must first complete a safety training course, successfully pass a full background check and, only then, will an individual be granted a permit-to-purchase a firearm, so that firearms are kept out of dangerous hands[.]"

Measure 114, preamble; *see also* Measure 114, § 2 (policy statement that the regulation "will promote the public health and safety of the residents of this state").

We thus observe that sections 3 through 10 of Measure 114 are a legislative response to identified public safety concerns stemming from dangerous individuals obtaining firearms and the dangerous practice of individuals untrained in firearm safety obtaining firearms. That is the type of legislative response that the drafters of Article I, section 27, did not intend to prohibit. *See Christian*, 354 Or at 31-33 (summarizing jurisprudence that explains that the drafters of Article I, section 27, did not intend to prohibit the legislature from enacting regulations that restrain dangerous practices or restrict possession by persons who pose

a threat to public safety); *see also Hirsch/Friend*, 338 Or at 679 (holding that Article I, section 27, does not prohibit the legislature from "restrict[ing] the possession of arms by the members of a group whose conduct demonstrates an identifiable threat to public safety"); *cf. State v. H. N.*, 330 Or App 482, 491, 545 P3d 186 (2024) (recognizing, in the context of a challenge under the Second Amendment to the United States Constitution, that "limitations on people with mental disorders possessing firearms are in fact 'longstanding'").

The permit-to-purchase program and point-of-transfer background check "reflect[] a contemporary legislative response to identifiable threats to public safety" and "a legislative determination that the risk of death or serious injury to members of the public" is increased by the threat posed by untrained and dangerous persons obtaining firearms. *Christian*, 354 Or at 34 (stating the same with respect to a city ordinance prohibiting carrying loaded firearms in public places without a concealed carry permit). The regulations chosen by the people to address those public safety threats are reasonable because they are directed at and drafted to address those identifiable threats. Both aspects of Measure 114 directly seek to identify persons disqualified to own or possess a firearm under state or federal law, to identify dangerous persons who either are the subject of an extreme risk protection order or have " been or [are] reasonably likely to be a danger to self or others, or to the community at large" based on their psychological state or past conduct, and to ensure that persons seeking to obtain firearms have completed a firearm safety course.

We also conclude that the permit-to-purchase program and point-of-transfer background check do not unduly frustrate the right guaranteed by Article I, section 27. Article I, section 27, does not provide an absolute right, but a right to armed self-defense that is subject to the wide latitude of the legislature "to enact specific regulations restricting the possession and use of weapons to promote public safety." *Christian*, 354 Or at 33. We are not persuaded that requiring a permit-to-purchase and passing a criminal background check—even if complying with those regulations causes a delay in obtaining a firearm—would render

Measure 114 unconstitutional *under all circumstances*. To the contrary, when the measure is executed as the text of the measure contemplates, it will not unduly frustrate the Article I, section 27, right to armed self-defense because a qualified individual will be able to obtain a firearm for the purposes of self-defense. Article I, section 27, does not confer the right to obtain a firearm immediately in all circumstances; it is a right to defend oneself using constitutionally protected arms. We decline to engage in any speculation about how the measure might be executed in the future and the effect that might have on any one individual's Article I, section 27, right. Those questions can only be explored through as-applied challenges that are not before us, as plaintiffs' complaint alleged a facial challenge and the circuit court ruled that it would address only a facial challenge, which is a ruling that plaintiffs do not challenge on appeal. Plaintiffs have not pointed to anything "within the language or history of the constitution itself," *Hirsch/ Friend*, 338 Or at 639, that limits the people of Oregon from enacting sections 3 through 10 of Measure 114, and we are aware of none.

We conclude that sections 3 through 10 of Measure 114, which include the permit-to-purchase program and point-of-transfer background check, are facially valid under Article I, section 27.

B.  *Large-Capacity Magazine Ban*

We next address the large-capacity magazine ban in Measure 114.

1.  *Text of section 11 of Measure 114*

Section 11 of Measure 114 is codified at ORS 166.355 and covers the ban on large-capacity magazines. The measure defines a large-capacity magazine as

"a fixed or detachable magazine, belt, drum, feed strip, helical feeding device, or similar device, including any such device joined or coupled with another in any manner, or a kit with such parts, that has an overall capacity of, or that can be readily restored, changed, or converted to accept, more than 10 rounds of ammunition and allows a shooter to

keep firing without having to pause to reload, but does not include any of the following:

"(A)   An ammunition feeding device that has been permanently altered so that it is not capable, now or in the future, of accepting more than 10 rounds of ammunition;

"(B)   An attached tubular device designed to accept, and capable of operating only with 0.22 caliber rimfire ammunition; or

"(C)   A tubular ammunition feeding device that is contained in a lever-action firearm."

Measure 114, § 11(1)(d).

Measure 114 makes it a Class A misdemeanor to manufacture, import, possess, use, purchase, sell, or otherwise transfer any large-capacity magazine in Oregon after the effective date of the measure. Measure 114, § 11(2), (6). There are exceptions to that ban for dealers and manufacturers to provide firearms to the United States Armed Forces or a law enforcement agency and for "[a]ny government officer, agent or employee, member of the Armed Forces of the United States or peace officer * * * that is authorized to acquire, possess or use a large-capacity magazine provided that any acquisition, possession or use is related directly to activities within the scope of that person's official duties." Measure 114, § 11(4). The measure also provides that it is an affirmative defense "to the unlawful possession, use and transfer of a large-capacity magazine in this state by any person" if the large-capacity magazine "was owned by the person before the effective date of [the measure] and maintained in the person's control or possession" or the person acquired possession "by operation of law upon the death of a former owner who was in legal possession of the large-capacity magazine" and as long as the owner only used the large-capacity magazine in the manner and at the locations authorized in the measure. Measure 114, § 11(5)(a) - (c). That affirmative defense also applies when "[t]he person has permanently and voluntarily relinquished the large-capacity magazine to law enforcement or to a buyback or turn-in program approved by law enforcement, prior to commencement of prosecution by arrest, citation or a formal charge." Measure 114, § 11(5)(d).

2.   *Article I, section 27, analysis*

We reiterate that what we must confront is whether the legislation is a reasonable regulation on the possession or use of a weapon to promote public safety without unduly frustrating the right to armed self-defense guaranteed by Article I, section 27. Our analysis is "limited to whether the [measure] is capable of constitutional application in any circumstance." *Christian*, 354 Or at 40.

At the outset, we decline to address the state's argument that magazines are not "arms" constitutionally protected under Article I, section 27. It is undisputed that ammunition magazines are required for firearms to be operable. We do not think that it is appropriate to approach this case by parceling out a firearm component from the firearm itself in addressing the constitutionality of Measure 114. We also do not think that the constitutionality of the ban should be dependent upon whether large-capacity magazines and firearms that could discharge multiple shots without reloading existed and were commonly used for self-defense at the time Article I, section 27, was adopted. It is undisputed in the historical record that limited, early forms of the technology did exist at that time, and we decline to base our constitutional analysis in this case on whether current forms of the technology are constitutionally protected. *But see OSSA v. Multnomah County*, 122 Or App 540, 548-49, 858 P2d 1315 (1993) (holding that a city ordinance restricting possession of "assault weapons" in public was constitutional because the semi-automatic firearms classified as assault weapons were not constitutionally protected arms because they derived from military weaponry and "mid-nineteenth century repeating firearms used for self-defense * * * were not in common use at the time"). We thus proceed based on the assumption that large-capacity magazines are part of constitutionally protected arms and use the same analytic framework that we applied to the other sections of Measure 114.

We first observe that the large-capacity magazine ban is not a ban on any particular type of firearm or constitutionally protected arm—it is a ban on possessing magazines that allow a firearm to discharge more than 10 rounds

without having to reload. We thus disagree with plaintiffs' characterization of the regulation as a ban on the mere possession or use of nearly any firearm. From the text of the measure, and legislative findings, we discern that the voters' intent in enacting the measure is to regulate the manner of possession or use of firearms in that it restricts the size of magazine that can be used with a firearm to make it operable; it is not a restriction of the mere possession of operable firearms themselves.[10]

---

[10] We note that the circuit court concluded that most firearms were banned by Measure 114 "because there is no effective way of limiting magazines to ten rounds or less by permanently alter[ing] them and the magazines are readily capable of alteration or changed to carry more than ten rounds within seconds." The court's reasoning was based on its reading of the definition of "large-capacity magazine" in Measure 114, which includes a magazine that "can be readily restored, changed, or converted to accept, more than 10 rounds of ammunition" and that "permanently altered" means that "it is not capable, now or in the future, of accepting more than 10 rounds of ammunition."

We reject the circuit court's line of reasoning for at least two reasons. First, it does not demonstrate that Measure 114 is incapable of constitutional application in any circumstance. The facts found by the circuit court demonstrate the ingenuity of persons trying to subvert manufacturer limits on magazines; those facts do not demonstrate that most magazines holding 10 or fewer rounds fall within the Measure 114 legal definition of large-capacity magazine, or, more importantly, that Measure 114, on its face, bans most firearms themselves, when the text of Measure 114 provides for no such ban on firearms. The reasoning employed by the circuit court appears to be grounded in concerns of constitutional overbreadth, which asks whether "the statute in question prohibits constitutionally protected conduct of any kind." *Hirsch/Friend*, 338 Or at 628. The Supreme Court in *Christian* made clear that that kind of facial challenge is not cognizable under Article I, section 27.

Second, we do not think the circuit court's expansive reading of the definition of "large-capacity magazine" comports with the legislative intent of Measure 114, which was not intended to ban all magazines. Moreover, "readily restored, changed, or converted to accept more than 10 rounds of ammunition" does not necessarily encompass the types of modifications the circuit court relied on. "Readily" is an adverb that encompasses both temporal *and* degree-of-difficulty components. *See Webster's Third New Int'l Dictionary* 1889 (unabridged ed 2002) (defining "readily" to include "with fairly quick efficiency : without needless loss of time : reasonably fast : SPEEDILY" and "with a fair degree of ease : without much difficulty : with facility : EASILY); *see also State v. Briney*, 345 Or 505, 516, 200 P3d 550 (2008) (construing "readily capable of use as a weapon" in *former* ORS 166.210(3) (2007) to mean "promptly able to be made so *at the time that an individual is alleged to be unlawfully carrying it concealed*" (emphasis in original)). Whether individuals can subvert the law in the future by undoing alterations to large-capacity magazines or by altering smaller-capacity magazines to hold more than 10 rounds has no bearing on whether Measure 114 is constitutional on its face. Whether any particular magazine in a prosecution for violation of Measure 114, section 11 meets the definition of large-capacity magazine and whether that application of the law violates Article I, section 27, are questions that must be explored on an as-applied basis.

We also observe that the large-capacity magazine ban is a contemporary legislative response to identified public safety concerns stemming from the advancements in technology and the availability of those advancements to the public that have created observable threats to public safety. The preamble to Measure 114 specifically states with respect to large-capacity magazines:

"Whereas the People of the State of Oregon have seen a sharp increase in gun sales, gun violence, and raised fear in Oregonians of armed intimidation, it is imperative to enhance public health and safety in all communities; and

"Whereas the gun violence in Oregon and the United States, resulting in horrific deaths and devastating injuries due to mass shootings, homicides and suicides is unacceptable at any level, and the availability of firearms, including semiautomatic assault rifles and pistols with accompanying large-capacity ammunition magazines, pose a grave and immediate risk to the health, safety and well-being of the citizens of this State, particularly our youth; and

"* * * * *

"Whereas large-capacity magazines are often associated with semiautomatic assault rifles, and can also be used with many semiautomatic firearms including shotguns and pistols, and estimates suggest that nearly 40% of crime guns used in serious violent crimes, including attacks on law enforcement officers, are equipped with large-capacity magazines; and

"Whereas firearms equipped with large-capacity magazines increase casualties by allowing a shooter to continue firing for longer periods of time before reloading, thus explaining their use in all 10 of the deadliest mass shootings since 2009, and in mass shooting events from 2009 to 2018 where the use of large-capacity magazines caused twice as many deaths and 14 times as many injuries, including the 2015 shooting at Umpqua Community College in Roseburg, Oregon in which 10 people were killed and 7 more were injured; and

"Whereas restrictions on high-capacity magazines during the 10-year federal ban from 1994-2004 and the ban in over nine (9) states and the District of Columbia have been found to reduce the number of fatalities and injuries

in shooting incidents, this measure will enhance the safety of residents, particularly children, of this state by prohibiting the manufacture, sale, or transfer of large-capacity ammunition magazines and regulate the use of such magazines that are currently owned[.]"

Measure 114, preamble; *see also* Measure 114, § 2 (policy statement).

By the findings contemplated by the people of Oregon when it enacted Measure 114, the use of large-capacity magazines presents a clear public safety threat to the welfare of the public because of the great increase in capacity to cause death and injury when a person may fire a firearm more than 10 times without having to reload. The ban on large-capacity magazines is a reasonable regulation directed at the specific, observable public safety concern that the people of Oregon sought to address.

The ban also does not unduly frustrate the right to armed self-defense guaranteed by Article I, section 27. In so concluding, we emphasize that the right is one of armed *defense* of person or property. Measure 114 does not affect any individual's Article I, section 27, right to use a firearm in defense of self or property. Measure 114 does limit an individual's ability to legally fire more than 10 rounds of ammunition without reloading while doing so. That limitation does not *unduly* frustrate the Article I, section 27, right. Plaintiffs assert that certain defensive scenarios benefit from the assistance of large-capacity magazines—most notably in rural areas where law enforcement response times are long, and livestock requires protection from predators. However, an individual's desire to use a large-capacity magazine for such purposes, instead of a capacity-compliant magazine, does not demonstrate that the large-capacity magazine ban in Measure 114 is incapable of constitutional application. Article I, section 27, does not provide an absolute right, but a right to armed self-defense that is subject to the wide latitude of the legislature "to enact specific regulations restricting the possession and use of weapons to promote public safety." *Christian*, 354 Or at 33.

We also reject the argument that allowing an affirmative defense to a prosecution for unlawful possession,

use, or transfer of a large-capacity magazine renders the measure unconstitutional. How the use of the affirmative defense may play out in any particular prosecution and whether the prosecution would violate the individual's right under Article I, section 27, is a question that can be answered only in an as-applied challenge, which is not before us on plaintiffs' facial challenge. We conclude that section 11 of Measure 114 does not unduly frustrate the right to armed self-defense that is guaranteed in Article I, section 27. Plaintiffs have not pointed to anything "within the language or history of the constitution itself," *Hirsch/ Friend*, 338 Or at 639, that limits the people of Oregon from enacting section 11 of Measure 114, and we are aware of none.

We conclude that section 11 of Measure 114, which covers the large-capacity magazine ban, is facially valid under Article I, section 27.

### III.   CONCLUSION

In sum, we hold that all of Ballot Measure 114 (2022) is facially valid under Article I, section 27, because the law is capable of constitutional application. *Christian*, 354 Or at 40. We reverse both the general judgment and the supplemental judgment. We remand to the circuit court for the limited purposes of entering a declaratory judgment consistent with this opinion and determining whether the state is entitled to fees or costs.

Reversed and remanded.